# STATE OF MICHIGAN

# COURT OF APPEALS

---

CHELSEA LEIGH JENKS, f/k/a CHELSEA
LEIGH HENNINGER,

       Plaintiff-Appellee,

v

LOUIS JOSEPH ABRAHAM,

       Defendant-Appellant.

UNPUBLISHED
April 21, 2016

No. 329894
Tuscola Circuit Court
LC No. 13-027771-DS

---

Before: JANSEN, P.J., and SERVITTO and M. J. KELLY, JJ.

PER CURIAM.

Defendant, Louis Joseph Abraham, appeals by right the trial court's order approving the Family Court referee's recommended order granting the petition by plaintiff, Chelsea Leigh Jenks, to change the domicile of the parties' minor child to Texas, and denying Abraham's objection to the recommended order. We conclude that there were no errors warranting relief. Accordingly, we affirm.

## I. BASIC FACTS

In September 2012, Abraham and Jenks had a child, M.A. In June 2014, the circuit court granted joint legal and physical custody of the child to both parties. Jenks had primary physical custody and Abraham exercised parenting time on alternate weeks from Wednesday to Sunday.

Jenks married in August 2014. Jenks' new husband was stationed in Fort Hood, Texas. In August 2014, Jenks petitioned the trial court to allow her to change M.A.'s domicile from Michigan to Texas; she also asked the court to alter Abraham's parenting time to two weeks every four months plus alternate holidays.

A referee considered Jenks' petition and found that Jenks did not support her request by a preponderance of the evidence under MCL 722.31(4). The referee also opined that, even if Jenks had met that burden, she failed to prove by clear and convincing evidence that the requested change in the established custodial environment would be in M.A.'s best interests. The referee advised the parties that, under MCR 3.215, the recommended order would be final if neither party filed a written objection within 21 days.

-1-

Jenks did not object to the referee's recommendation. In January 2015, she took M.A. to Texas. Thereafter, the circuit court issued an ex parte order granting Abraham temporary sole physical custody, and later found Jenks in contempt of court for violating the court's order.

In March 2015, Jenks asked the court to set aside the ex parte order and to "reconsider" her petition for a change in domicile. Jenks alleged that Abraham deliberately led her to believe that if she refrained from objecting to the referee's recommendation, he would negotiate a resolution that would allow her to relocate to Texas with M.A. However, after the expiration of the period for objecting, he refused to negotiate.

In March 2015, the trial court set aside the ex parte order and restored its June 2014 order governing custody. The court refused to revisit the referee's earlier order denying Jenks' petition, but advised Jenks that she could file a new petition or seek appellate review. Jenks thereafter again petitioned for a change in domicile.

Abraham moved to dismiss the new petition on the ground that Jenks had not established a change in circumstances since the last petition that would warrant a change in domicile. The trial court denied the motion and allowed the petition to proceed; the court, however, emphasized that the referee could consider only those changes in circumstances that had occurred after November 18, 2014, which was the date of the court's order denying Jenks' first petition. In response, Abraham asked for sole custody of the child.

Abraham testified about the circumstances surrounding the last order. He stated that he had "not necessarily" coerced Jenks into refraining from objecting to the order within the 21-day period for objecting, but acknowledged that he had told her that the two of them would "work something out" if she did not object to the proposed order. He also agreed that Jenks reasonably relied on his assurances; he explained that he had thought that they would be able to come to an agreement, but "it just never worked out that way."

During the hearing on Jenks' second petition to change domicile, Jenks testified that her circumstances had changed "drastically" since the order denying her first petition. Several of her relatives testified that she and her children stayed with them when she was in Michigan, and Jenks said she could not afford permanent housing in Michigan because she and her husband had to maintain their residence in Texas. She further testified that she gave birth to her second child and, as a result of the circumstances, her second child had not been able to see her father for the past five months.

Jenks' lawyer argued that the relocation of Jenks' husband to Texas since the last order should be considered a change in circumstances because the move to Texas was merely a "proposed move" at that time. Moreover, according to her lawyer, Jenks was now aware that the change of domicile would offer various educational and other opportunities that would greatly improve the quality of M.A.'s life as well as Jenks' life.

The referee found that Jenks had established by a preponderance of the evidence grounds for a change of domicile under MCL 722.31(4). Because there was an established custodial environment with both parents, the referee examined whether the change of domicile would be in M.A.'s best interests. Although the referee found that the parties were equal on most of the

factors, she found that it was in the child's best interests to change her domicile to Texas and recommended that Abraham's motion to change custody be denied.

Abraham filed a written objection to the referee's second recommendation, arguing that the referee violated the circuit court's directive to rely only on facts that had changed since the date of its first order, and that the referee failed to find by clear and convincing evidence that the change was in M.A.'s best interests. The circuit court dismissed Abraham's objections as untimely because he filed them one day after the expiration of the 21-day period for filing objections under MCR 3.215.

Abraham now appeals in this Court.

## II. PROCEDURAL ERROR

Abraham argues first that the court erred when it determined that his objection to the referee's second recommended order was untimely because the referee and the court committed errors that prevented the period for filing objections from running. This Court reviews de novo whether the trial court properly interpreted and applied the relevant statutes and court rules. *Kaeb v Kaeb,* 309 Mich App 556, 564; 873 NW2d 319 (2015).

Under MCR 3.215(E)(1)(c), if the circuit court approves the referee's recommended order "and no written objection is filed . . . within 21 days after service, the recommended order will become a final order." The record shows that the referee's second report and recommendation was served on the parties on June 23, 2015; thus, the parties had until July 14, 2015 to file any objections. Abraham filed his objection on July 15, 2015. Nevertheless, he argues that it was not untimely because the trial court did not approve the order before it was served on the parties, which he asserts was "a necessary precondition" to start the 21-day period for filing objections. He also argues that the referee's notice of the right to a judicial hearing was inadequate.

Under MCR 3.215(E)(1), after a hearing, the referee must "make a recommendation for an order and arrange for it to be submitted to the court and the attorneys for the parties, or the parties if they are not represented by counsel." The referee's recommended order must include, in relevant part, "notice that if the recommended order is approved by the court and no written objection is filed with the court clerk within 21 days after the recommended order is served, the recommended order will become the final order." MCR 3.215(E)(1)(b)(ii). It must also include a "prominent notice of all available methods for obtaining a judicial hearing." MCR 3.215(E)(1)(b)(iv). Finally, a referee's order can become final if approved by the court and there are no objections:

> If the court approves the referee's recommended order, the recommended order must be served within 7 days of approval, or within 3 days of approval if the recommended order is given interim effect, and a proof of service must be filed with the court. If the recommendation is approved by the court and no written objection is filed with the court clerk within 21 days after service, the recommended order will become a final order. [MCR 3.215(E)(1)(c).]

-3-

When MCR 3.215(E)(1)(c) is read in isolation, it could support Abraham's preferred reading. Specifically, it requires service of the recommended order *after* it is approved, and then provides that it becomes final if there is no objection filed within 21 days *after* service. This could plausibly mean that the 21-day period does not begin to run until after the approved order is served on the parties. But this rule could also be understood to require the parties to file their objections within 21-days of service of the recommended order—as opposed to the approved order—which recommended order will become final if the court approves it at any time and there were no written objections during the 21-day period. In other words, the language "no written objection is filed with the court clerk within 21 days after service" could refer to service of the recommended order prior to approval by the court or service of the order after approval.

When read in the context of the other provisions in the court rule, it is evident that the 21-day period must logically begin after service of the recommended order on the parties without regard to whether the trial court has approved it. MCR 3.215(E)(1)(b)(ii), for example, provides that a referee's recommended order must include a notice that informs the parties that if "no written objection is filed with the court clerk within 21 days after the recommended order is served, the recommended order will become the final order." Likewise, MCR 3.215(E)(4) states that a party may obtain a judicial hearing on "any matter that has been the subject of a referee hearing and that resulted in a . . . recommended order by filing a written objection and notice of hearing within 21 days after the referee's recommendation for an order is served . . . ." It does not provide that the objections must be filed within 21 days after the trial court approves the order. Similarly, the Legislature provided that a trial court must "hold a de novo hearing on any matter that has been the subject of a referee hearing, upon the written request of either party," but only if the request is "made within 21 days after the recommendation of the referee is made available to that party." MCL 552.507(4). Thus, understood in context, it is clear that 21-day period begins to run after service of the recommended order and without the need for the court's prior approval; it simply will not become a final order—even if there are no objections—until after the trial court approves the order.

Abraham also argues that the 21-day period did not commence because the referee's notice did not comply with the court rule. Specifically, he maintains that the recommended order included only one statement explaining how the parties could obtain a judicial hearing, which provided that the parties could "request a de novo hearing before the Family Division Judge by filing a written objection pursuant to MCL 552.507(5), MCR 3.215(E)(3)(b)." Abraham argues that the reference to the statute and court rule is deficient because neither explains the standard by which a party may request a judicial hearing.

Included with the referee's report and recommended order was a "Notice of Submission on Order of 21 Day Notice," which provided that the parties could request a de novo hearing before the family court judge by filing a written objection. The notice informed the parties where they could obtain objection forms, and specified that the objection should "specifically set forth the portion(s) of the Referee's findings and recommendation objected to and the basis of the objection." The notice further provided that the objection had to be filed with the county clerk and served upon the Friend of the Court and the opposing party "within 21 days after the recommendation is mailed pursuant to Michigan Court Rules," and that, "[i]f no written objection is received within said period, the recommendation shall become the order of the court to be entered without further notice to either party." The record further shows that the referee

-4-

verbally informed the parties of these requirements before the hearing on Jenks' second petition. Although the referee's citations to MCL 552.507(5) and MCR 3.215(E)(3)(b) did not direct the parties to the specific provisions governing how to obtain a de novo hearing, the referee also generally cited MCR 3.215, which does provide the pertinent information.

The notice provided by the referee was sufficient to apprise the parties of their rights and the means by which they could assert their rights.

## III. INDEPENDENT FINDINGS

Abraham argues that the trial court violated the Child Custody Act, MCL 722.21 *et seq.*, by declining to reach the merits of his objections. According to him, the statute required the court to independently determine whether the referee's recommendation regarding custody was in the best interests of the child as set forth in MCL 722.23. Abraham relies on the decision in *Rivette v Rose-Molina*, 278 Mich App 327, 332-333; 750 NW2d 603 (2008), for the proposition that a trial court errs where it enters an order affecting custody without first either satisfying itself that the referee considered the best interests of the child, or making its own findings regarding the best interests of the child.

In *Rivette*, this Court reversed the decision of the trial court denying the defendant's petition for change of custody. *Id.* at 328. The Court concluded that both the referee and the trial court erred by failing to make findings of fact or to consider the statutory best-interest factors. *Id.* The Court explained:

> It would stand to reason that, if an analysis of the best interest-factors is required in the circuit court to assure that the custody determination is based on an informed decision about the child's best interest, a referee's custody recommendation—which the circuit court may uphold *without making any independent findings concerning the child's best interests*—likewise should include consideration of the best-interest factors. Although a referee perhaps need not engage in the same type of in-depth, lengthy analysis as a judge in a custody hearing would, some meaningful consideration of the best-interest factors is nevertheless necessary to ensure that the referee considers all the relevant criteria and makes an informed decision. [*Id.* at 330 (emphasis added).]

As the Court recognized in *Rivette*, the trial court was not required to make "any independent findings concerning the child's best interests" before approving the recommendation of the referee as long as the record shows that the referee considered the child's best interests. *Id.* Additionally, the court rule does not require an independent determination of the best interests factors where no objection has been timely filed, nor does it require the court to make independent findings of fact during a judicial hearing held after an objection. See MCR 3.215(F).

The court was not required to reach the merits of Abraham's objections.

## IV. SECOND RECOMMENDED ORDER

Abraham next argues that the trial court erred by adopting the referee's second recommended order. He maintains that the trial court erred by adopting the order because Jenks did not establish that her second petition to change domicile was warranted by a change of circumstances, as required under *Vodvarka v Grasmeyer*, 259 Mich App 499; 675 NW2d 847 (2003). He similarly argues that Jenks' second petition was barred by the doctrines of res judicata and collateral estoppel, and undermined the public policy in favor of the finality of judgments. Finally, Abraham argues that the referee's second recommendation was contrary to the great weight of the evidence, and that the referee committed legal error in concluding that Jenks had met her burden.

### A. CHANGE IN CIRCUMSTANCES

The circuit court directed the referee to rely on facts that had occurred after the entry of the court's order of November 18, 2014—in which it denied Jenks' first petition—when determining whether there had been a change of circumstances or proper cause sufficient to revisit domicile. Nevertheless, Abraham complains that the referee did not follow the court's instructions and failed to identify a change in circumstances.

Under the Child Custody Act, a party seeking to modify custody or parenting time must first show, by a preponderance of the evidence, a "proper cause or a change of circumstances sufficient to warrant reconsideration of the custody decision." *Gerstenschlager v Gerstenschlager*, 292 Mich App 654, 657; 808 NW2d 811 (2011); MCL 722.27(1)(c). "[P]roper cause means one or more appropriate grounds that have or could have a significant effect on the child's life to the extent that a reevaluation of the child's custodial situation should be undertaken." *Vodvarka*, 259 Mich App at 511.

> [T]o establish "proper cause" necessary to revisit a custody order, a movant must prove by a preponderance of the evidence the existence of an appropriate ground for legal action to be taken by the trial court. The appropriate ground(s) should be relevant to at least one of the twelve statutory best interest factors, and must be of such magnitude to have a significant effect on the child's well-being. When a movant has demonstrated such proper cause, the trial court can then engage in a reevaluation of the statutory best interest factors. [*Id.* at 512.]

In order to establish a change of circumstances warranting revisiting custody, the "movant must prove that, since the entry of the last custody order, the conditions surrounding custody of the child, which have or could have a *significant* effect on the child's well-being, have materially changed." *Id.* at 513 (emphasis in original). A material change must be something other than the normal life changes that accompany a child's growth and development. *Id.* The Court further clarified, "there must be at least some evidence that the material changes have had or will almost certainly have an effect on the child. This too will be a determination made on the basis of the facts of each case, with the relevance of the facts presented being gauged by the statutory best interest factors." *Id.* at 513-514.

In this case, the referee noted two changes that had occurred since entry of the last order: the parties were having difficulty in communicating with each other and Jenks was "bouncing from household to household" in Michigan with her children. Regarding the parties' communication, the referee commented on Abraham's efforts to dissuade Jenks from objecting to the prior recommended order. Although the referee opined that Jenks was an intelligent adult who should have filed a timely objection, the referee also found that Abraham had not been "honest and open with her" and the "parties did not communicate in a healthy fashion." This, the referee stated, was in contrast to prior practice where the parties "mostly communicated well and exercised parenting time pursuant to court order." The parties' new found inability to communicate and cooperate concerning M.A.'s care was a material change that could significantly affect M.A.'s well-being. See *Vodvarka*, 259 Mich App at 513. Additionally, although the referee stated that she was "not sympathetic" to Jenks' decision to bounce from house to house because that was "her choice," the referee recognized that the lack of a stable living situation since the entry of the first order was also a material change which was likely to significantly affect M.A.'s well-being. See *id.* Consequently, there was evidence of changes in the circumstances sufficient to support the referee's decision to consider Jenks' second petition.

## B. RES JUDICATA, ESTOPPEL, FINALITY

The doctrines of res judicata and collateral estoppel apply to subsequent lawsuits; they do not apply to ongoing litigation. See *Bryan v JP Morgan Chase Bank*, 304 Mich App 708, 715-716; 848 NW2d 482 (2014). Moreover, as already discussed above, the Child Custody Act specifically provides criteria for revisiting custody determinations and those criteria were met in this case. Accordingly, Abraham cannot rely on res judicata or collateral estoppel to prevent Jenks from asking the trial court to reexamine a previous custody order. For similar reasons, we reject Abraham's public policy argument. The court properly allowed Jenks to exercise her right to petition the court to modify or amend its previous judgments or orders to the extent allowed under MCL 722.27(1)(c).

## C. GREAT WEIGHT OF THE EVIDENCE

Finally, Abraham argues that the referee's second recommendation is contrary to the great weight of the evidence. Specifically, he objects to the referee's findings on the factors listed under MCL 722.31(4) concerning a change of domicile request, and to the referee's analysis of the best interests factors under MCL 722.23.

MCL 722.31(4) provides that, when considering a change of domicile, the circuit court must consider the following factors "with the child as the primary focus in the court's deliberations":

(a) Whether the legal residence change has the capacity to improve the quality of life for both the child and the relocating parent.

(b) The degree to which each parent has complied with, and utilized his or her time under, a court order governing parenting time with the child, and whether the parent's plan to change the child's legal residence is inspired by that parent's desire to defeat or frustrate the parenting time schedule.

(c) The degree to which the court is satisfied that, if the court permits the legal residence change, it is possible to order a modification of the parenting time schedule and other arrangements governing the child's schedule in a manner that can provide an adequate basis for preserving and fostering the parental relationship between the child and each parent; and whether each parent is likely to comply with the modification.

(d) The extent to which the parent opposing the legal residence change is motivated by a desire to secure a financial advantage with respect to a support obligation.

(e) Domestic violence, regardless of whether the violence was directed against or witnessed by the child.

The referee found that Jenks showed by a preponderance of the evidence that the move to Texas was supported by these factors. Abraham contests the referee's findings only as to the first factor.

The referee found that the move to Texas unquestionably had the capacity to improve Jenks' quality of life. The referee found that, if permitted to move to Texas, Jenks would be able to live with her husband and youngest child as a family unit, "enroll in school and hopefully begin a career path. She will have a stable residence and have more security and stability available to her." Abraham protests that the record does not demonstrate "that educational opportunities in Texas are greater than those in Michigan." However, the referee's inquiry was not whether Texas offered better educational opportunities than Michigan; it was whether the change had the *capacity* to improve Jenks' quality of life. MCL 722.31(4)(a). Jenks testified that she would be able to attend school in Texas at the military's expense, while she would have to work full-time if she were required to live in Michigan. Hence, there was evidence to support this finding.

Abraham also challenges the referee's finding that the move had the capacity to improve M.A.'s life. According to the referee, the move to Texas offered M.A. a more stable living environment where she would have access to daycare and preschool. In addition, as M.A. seemed "to have a good relationship with her stepfather," the move also offered the opportunity for M.A. to live with her mother, stepfather, and half-sister as a stable family unit. Abraham disputes this finding, and argues that Jenks cannot guarantee any sort of stability for M.A. because her husband's military career might require the family to relocate. Although the possibility that Jenks' husband may be transferred is a consideration, the possibility does not by itself warrant a finding that M.A.'s life will not be more stable in Texas. The benefits to M.A. of living within a stable family unit may outweigh any instability potentially caused by future relocations.

This Court has held that when a "traditional, nuclear" family is an option, living with that family may be in the best interests of the child if it is a more permanent and stable environment than the single parent can offer. See *Mogle v Scriver*, 241 Mich App 192, 199-200; 614 NW2d 696 (2000). The record showed that Abraham lived in a home with his younger brother, and although he had a girlfriend who visited the home on weekends with her child, there was no

evidence that Abraham and his girlfriend planned to live together or marry and establish a stable family unit comparable to that planned by Jenks and her husband. Therefore, it was not error for the referee to find that Jenks could provide a more stable and "permanent" living environment to the child. Additionally, we are not persuaded by Abraham's assertion that this Court should consider the Jenks' new husbands military career as an impediment to her ability to parent. There is no authority for the proposition that a person cannot adequately serve as a custodial parent because her husband is in the active military.

Finally, Abraham argues that the referee's evaluation of the best interests factors and ultimate finding were contrary to the great weight of the evidence. Courts are required to consider the "best interest" factors stated under MCL 722.23 when making decisions affecting child custody. The referee found that the parties were equal as to the majority of the factors. However, the referee found that factor (c) favored Abraham and factor (l) favored Jenks. See MCL 722.23(c) and (l). Abraham challenges only the findings for those two factors.

Abraham argues that, on the basis of the referee's evaluation of MCL 722.23(c), he should have been granted sole custody because Jenks has no ability to independently provide for M.A. because she intended to be a stay-at-home mother. Abraham cites no authority for the proposition that a parent should be penalized for electing to be a stay-at-home parent or that a stay-at-home parent's ability to provide material support for a child must be examined independently of his or her spouse's income; and we are aware of no such authority. While the referee found that this factor favored Abraham, he has not demonstrated that the referee's finding on this factor should have been dispositive as to the outcome of the case.

Abraham also argues that the referee erred by considering M.A.'s relationship with her half-sibling, Jenks' second child, as part of her analysis of the factors under MCL 722.23(l). The referee found that M.A. "should be afforded the opportunity to bond with her younger sibling." The referee cited *Wiechmann v Wiechmann*, 212 Mich App 436; 538 NW2d 57 (1995), for the proposition that she had to consider the sibling bond as part of the best interests analysis. We agree that the referee was not *required* to consider the sibling bond under *Wiechmann*, but conclude that she did not err by doing so.

In *Wiechmann*, this Court stated that "[a]lthough the maintenance of the sibling bond is not explicitly mentioned as a factor to be considered in determining the best interest of a child in a custody dispute, we believe that such consideration is appropriate under several of the statutory factors under MCL 722.23," including factor l. *Wiechmann*, 212 Mich App at 441 n 2. Further, "[t]he sibling bond and the potentially detrimental effects of physically severing that bond should be seriously considered in custody cases where the children likely have already experienced serious disruption in their lives as well as a sense of deep personal loss." *Id.* at 439-440. Although the Court must ultimately consider only "the best interests of each individual child," "in most cases it will be in the best interests of each child to keep brothers and sisters together." *Id.* at 440.

Although *Wiechmann* did not explicitly require the referee to consider M.A.'s bond with her new sibling, the referee's misstatement was harmless. The referee did not rely exclusively upon the sibling bond in making her recommendation, nor is there any indication in the report that she weighed this factor more heavily than the other best interest factors. Indeed, the sibling

bond was not the only "other relevant" factor considered by the referee under MCL 722.23(l). The referee also considered that her decision would necessarily deprive either Jenks' husband or Abraham of regular contact with their child; the length of the commute from Michigan to Texas; and that Jenks would likely be able to be a "better parent" to M.A. due to greater financial, emotional, and housing stability in Texas. Abraham has not demonstrated that the referee committed legal error by considering these factors. Further, he has not established that the referee's ultimate decision was in error.

There were no errors warranting relief.

Affirmed.

/s/ Kathleen Jansen
/s/ Deborah A. Servitto
/s/ Michael J. Kelly