MOGLE v SCRIVER

Docket No. 221194. Submitted March 15, 2000, at Lansing. Decided May 16, 2000, at 9:20 A.M.

Kara Mogle filed a complaint in the Ingham Circuit Court, Family Division, against Andrew Scriver, seeking a determination of custody, support, and parenting time relative to the parties' minor daughter. The parties were never married. Their child was born with and continues to suffer from various medical problems. The plaintiff moved for permission to change the child's domicile from Michigan to Virginia, where the plaintiff would join her new husband and stay home to care for the child. The defendant filed a countercomplaint for sole custody. Following a trial, the court, Lawrence M. Glazer, J., entered an order that, among other things, awarded the plaintiff primary physical custody of the child and granted the change of domicile. The defendant appealed.

The Court of Appeals *held*:

1. The trial court's finding that the child had an established custodial environment only with the plaintiff was not against the great weight of the evidence. The testimony at trial indicated that the child lived with the plaintiff almost exclusively for the first two years of its life and a majority of days and nights thereafter.

2. The trial court did not err in finding that the plaintiff's recent marriage was a factor that weighed in favor of the plaintiff in terms of primary physical custody. MCL 722.23(1); MSA 25.312(3)(l). The trial court did not impermissibly determine that placement of the child with the plaintiff was more acceptable, but essentially determined that the plaintiff's marriage and plans to be a stay-at-home mother meant that the child would be in a more stable environment with the plaintiff.

3. The trial court did not clearly err in disregarding an incident in which the plaintiff spent a night at a male co-worker's home without telling her husband. The trial court was free to believe the plaintiff's explanation and to reject the defendant's contention that the plaintiff's marriage was unstable and she would not be able to raise the child in a traditional nuclear family.

4. The trial court did not err in not finding that the plaintiff's attention deficit disorder prevented her from properly caring for

the child. A psychologist had testified that the disorder did not preclude good parenting, and the trial court gave the defendant a slight advantage with respect to MCL 722.23(g); MSA 25.312(3)(g), which concerns the mental and physical health of the parties.

5. The trial court did not abuse its discretion in allowing the plaintiff to remove the child from Michigan. The trial court did not err in finding that the move has the capacity to improve the quality of life for both the custodial parent and the child and that the visitation plan provides a realistic opportunity to preserve and foster the parental relationship previously enjoyed by the noncustodial parent.

Affirmed.

1. PARENT AND CHILD — CHILD CUSTODY — MODIFICATION.

A court may not issue a judgment or order that changes a child's established custodial environment unless there is clear and convincing evidence that it is in the child's best interests to do so (MCL 722.27[1][c]; MSA 25.312[7][1][c]).

2. PARENT AND CHILD — CHILD CUSTODY — ESTABLISHED CUSTODIAL ENVIRONMENT.

An established custodial environment is one of significant duration in which the relationship between the custodian and the child is marked by qualities of security, stability, and permanence (MCL 722.27[1][c]; MSA 25.312[7][1][c]).

3. PARENT AND CHILD — CHILD CUSTODY — CHILDREN'S BEST INTERESTS.

A court, in determining a child's best interests in terms of custody, must not consider the acceptability of the home to be established by each parent, but instead must concentrate on the permanence or stability of the family environment offered by each parent (MCL 722.23; MSA 25.312[3]).

4. PARENT AND CHILD — CHILD CUSTODY — CHANGE OF DOMICILE TO ANOTHER STATE.

A court, in ruling on a motion by a custodial parent to change the child's domicile to another state, must consider whether the prospective move has the capacity to improve the quality of life for both the custodial parent and the child, whether the move is inspired by the custodial parent's desire to defeat or frustrate visitation by the noncustodial parent and whether the custodial parent is likely to comply with the substitute visitation orders where the custodial parent is no longer subject to the jurisdiction of the courts of this state, the extent to which the noncustodial parent, in resisting the move, is motivated by the desire to secure a financial advantage in respect of a continuing support obligation, and the

degree to which the court is satisfied that there will be a realistic opportunity for visitation in lieu of the weekly pattern that can provide an adequate basis for preserving and fostering the parental relationship with the noncustodial parent; the party making the motion has the burden of establishing by a preponderance of the evidence that the change in domicile is warranted.

*Loomis, Ewert, Parsley, Davis & Gotting, P.C.* (by *Catherine A. Jacobs* and *Kelly K. Reed*), for the plaintiff.

*Lynch, Gallagher, Lynch & Martineau* (by *Jennifer M. Galloway*), for the defendant.

Before: BANDSTRA, C.J., and CAVANAGH and ZAHRA, JJ.

BANDSTRA, C.J. Defendant Andrew Scriver appeals as of right from a family court order awarding plaintiff primary physical custody of Kaylah Scriver, the parties' daughter, and changing Kaylah's state of domicile from Michigan to Virginia. We find no error in the trial court's decision and affirm.

Plaintiff and defendant were not married at the time of Kaylah's birth, but dated each other intermittently during their high school years and for approximately 1½ years before Kaylah was born. Defendant ended the relationship three days after he learned of plaintiff's pregnancy because he did not want "to feel trapped." Both parties were twenty years old when Kaylah was born, and each had taken some college courses.

Kaylah was born with serious health problems, including cerebral palsy, frequent seizures, and von Willebrand's disease, an incurable condition that

affects the ability of a person's blood to clot properly. A medical doctor testified that Kaylah's cerebral palsy affected the right side of her body and prohibited her from walking and manipulating the fingers on her left hand. He described Kaylah as a "high needs" child who would need to undergo occupational therapy, physical therapy, and speech therapy until she reached adulthood.

At the time Kaylah was born, plaintiff was employed as a waitress and shared an apartment with a roommate, but she soon moved in with her parents to save on living expenses. Plaintiff testified that, after Kaylah was born, defendant visited her only one day a week. However, after Kaylah's hip surgery, when she was almost two years old, the frequency of his visits increased. Over time, the parties arranged a schedule whereby defendant would take Kaylah to his house two nights a week and to his parents' house every Friday night. The lower court record reflects that both parties had hectic and unpredictable work schedules, that each shared responsibility for taking Kaylah to her various appointments, and that they received help from their respective parents.

Plaintiff filed the instant action on May 2, 1997, in anticipation of her marriage to Mark Mogle. Plaintiff married Mogle on April 18, 1998, two days before the commencement of trial. At time of trial, Mogle was enlisted in the United States Air Force and was assigned to Langley Air Force Base, near Hampton, Virginia. Plaintiff sought an order awarding her custody of Kaylah and allowing her to move Kaylah's domicile to Virginia. Defendant filed a countercomplaint in which he requested sole custody of Kaylah. The trial court found: (1) a custodial environment

was established only with plaintiff; (2) many of the factors it was required to consider in making a determination regarding custody weighed equally with respect to both parties; (3) plaintiff's marriage to Mogle allowed her to better provide for Kaylah's food, clothing, and medical needs because plaintiff planned to assume the role of a stay-at-home mother; (4) plaintiff would be able to better provide a permanent family unit for Kaylah; and (5) plaintiff's marriage to Mogle would allow Kaylah to grow up in a traditional nuclear family, which the court reasoned should weigh in plaintiff's favor. The court awarded primary physical custody of Kaylah to plaintiff and authorized a change in Kaylah's domicile to Virginia. The court granted parenting time to defendant that generally allowed him to have Kaylah for two weeks every other month.

We review the trial court's findings of fact to determine whether they are against the great weight of the evidence, the court's discretionary rulings for a palpable abuse of discretion, and questions of law for clear legal error. MCL 722.28; MSA 25.312(8); *McCain v McCain*, 229 Mich App 123, 125; 580 NW2d 485 (1998). Under the "great weight of the evidence" standard, a trial court's findings should be affirmed unless the evidence clearly preponderates in the opposite direction. *Fletcher v Fletcher*, 447 Mich 871, 879 (BRICKLEY, J.), 900 (GRIFFIN, J.); 526 NW2d 889 (1994); *Ireland v Smith*, 214 Mich App 235, 242; 542 NW2d 344 (1995) (*Ireland I*). The abuse of discretion standard applies to the trial court's discretionary rulings; to whom custody is granted is such a discretionary disposition ruling. *Fletcher, supra* at 879-880

(BRICKLEY, J.), 900 (GRIFFIN, J.); *Fletcher v Fletcher*, 229 Mich App 19, 24; 581 NW2d 11 (1998).

Defendant first argues that the trial court's factual finding that Kaylah had an established custodial environment with plaintiff was against the great weight of the evidence. Whether an established custodial environment exists is a question of fact that the trial court must address before it makes a determination regarding the child's best interests. *Overall v Overall*, 203 Mich App 450, 455; 512 NW2d 851 (1994).

MCL 722.27(1)(c); MSA 25.312(7)(1)(c) states in relevant part:

> The court shall not modify or amend its previous judgments or orders or issue a new order so as to change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child. The custodial environment of a child is established if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort. The age of the child, the physical environment, and the inclination of the custodian and the child as to permanency of the relationship shall also be considered.

Defendant argues that the trial court should have found that an established custodial environment existed with respect to both parties, not just with plaintiff. An established custodial environment is one of significant duration "in which the relationship between the custodian and child is marked by qualities of security, stability and permanence." *Baker v Baker*, 411 Mich 567, 579-580; 309 NW2d 532 (1981); *DeVries v DeVries*, 163 Mich App 266, 271; 413 NW2d 764 (1987). An established custodial environment, however, need not be limited to one household; it can

exist in more than one home. *Duperon v Duperon*, 175 Mich App 77, 80; 437 NW2d 318 (1989).

We conclude that the trial court did not err in determining that Kaylah had an established custodial environment with plaintiff only. Trial testimony revealed that defendant became involved in Kaylah's life and helped to provide for her care. The trial court noted that the parties' sacrifice and work "reflect great credit to all concerned." Nevertheless, Kaylah lived with plaintiff almost exclusively for the first two years of her life, and thereafter she continued to spend the majority of her days and nights with plaintiff. The testimony at trial did not clearly preponderate in defendant's direction, and the trial court did not err in finding that an established custodial environment existed with plaintiff only.

Defendant also argues that the trial court erred in its analysis of the criteria for determining Kaylah's best interests, contained in MCL 722.23; MSA 25.312(3). He first contends that the trial court impermissibly determined that plaintiff's recent marriage was an additional factor that weighed in plaintiff's favor. MCL 722.23(l); MSA 25.312(3)(l) allows the trial court to consider anything that it deems relevant to the custody dispute. The trial court stated the following with respect to this factor:

> In the long run it is—to me, it is in this child's best interests to live with a traditional nuclear family if that option is available to her. While the grandparents are still maintaining diligent efforts to care for this child, time takes a toll on us all and, as time goes on, it's going to be more and more difficult for them to be there for her, and I believe the best environment is that provided by a husband and wife living together.

Defendant cites *Ireland v Smith*, 451 Mich 457; 547 NW2d 686 (1996) (*Ireland II* ), in support of his argument. In *Ireland II*, the Supreme Court determined that, in making their "best interests" determination, trial courts must not consider the "acceptability" of the homes to be established by each parent, but instead must concentrate on the "permanence" or "stability" of the family environments offered by the contesting parents. *Id.* at 464-465. *Ireland II* involved two unmarried parents, not one who remained single and another who was marrying and thus presenting the prospects of a two-parent family such as in this case. Considering the two single-parent situations before it, the *Ireland II* Court could "discern no significant difference between the stability of the settings proposed by the two parties." *Id.* at 465. While recognizing that "in some respects, Mr. Smith's proposed custodial home appears more stable" the Court also indicated that his single status made a finding of long-term stability problematic:

> However, that stability may be chimerical. He will not live with his parents forever, and until the likely path of his life becomes more apparent, it is difficult to determine accurately how stable a custodial home he can offer. [*Id.* at 466.]

Considering the stated reasoning of the trial court in the present case, we do not conclude that it is in contravention of *Ireland II*. Notwithstanding defendant's characterization, the trial court did not impermissibly conclude that a two-parent home is preferable to a single-parent home simply because it is more "acceptable." Instead, the trial court compared the two alternatives with respect to the permanence and

stability they offered the child. The court reasoned that defendant's parents, who, defendant argued, have played a crucial role in providing care for the child and would continue to do so in the future, would find that task increasingly difficult as they become older. In contrast, considering "the long run," the court concluded that "it is in this child's best interest to live with a traditional nuclear family . . . provided by a husband and wife together." In essence, the trial court's findings under factor l merely expanded on its findings under factors d and e, in which the court analyzed the length of time Kaylah had lived in a stable and satisfactory environment, the desirability of maintaining continuity, and the permanence of the existing or proposed custodial unit. Under both factors, the court discussed plaintiff's marriage to Mogle and the advantages to Kaylah of living in a nuclear family with a full-time mother. Under factor l, the court merely synthesized its findings under the other factors to explain its opinion that a nuclear family with a stay-at-home mother presented a more stable environment. In each of the trial court's findings, it limited its consideration to permanence and stability. We find this analysis to be entirely consistent with *Ireland II*.[1]

---

[1] We also note that *Ireland II* considered subsection e of the best interests factors, whereas the court's analysis in this case was of the "catch all" factor, subsection l. We do not conclude, however, that *Ireland II* is inapplicable here merely because a different statutory factor was at issue. It would be inappropriate for a court to use the "catch all" provision to allow an analysis of the best interests of a child that our Supreme Court has otherwise concluded is inappropriate under the statute.

Nonetheless, there is a distinction between the present case and *Ireland* that bears mentioning. In *Ireland II, supra,* the trial court's findings were the foundation for its order changing custody, *id.* at 461; *Ireland I, supra* at 241, notwithstanding the presumption in favor of maintaining an

Defendant also argues that the trial court erred in ignoring the fact that, shortly after plaintiff married Mark Mogle, she spent the night with a male co-worker, and twice did not tell her husband that she did so. Defendant invites us to conclude from these facts that plaintiff's marriage was unstable, and that the court therefore erred in determining that plaintiff would be able to raise Kaylah in a traditional nuclear family.

When reviewing the trial court's findings of fact, this Court defers to the trial court on issues of credibility. *Harper v Harper*, 199 Mich App 409, 414; 502 NW2d 731 (1993). Plaintiff testified that she and the co-worker were merely friends who liked to watch movies after work, and that she spent the night at his house because she did not want to leave late at night. The trial court was free to believe plaintiff's testimony and therefore did not clearly err when it disregarded these incidents and found that plaintiff would be able to provide a stable nuclear family for Kaylah.

Defendant also asserts that the trial court erred in not finding that plaintiff's attention deficit disorder prevented her from properly caring for Kaylah. However, a psychologist testified that, in his opinion, attention deficit disorder did not preclude good parenting. Furthermore, defendant neglects the fact that the trial court did consider the fact that plaintiff might suffer from attention deficit disorder when it gave him a "slight advantage" with respect to factor g,

---

established custodial environment. See *Straub v Straub*, 209 Mich App 77, 79; 530 NW2d 125 (1995). In the present case, the trial court was analyzing the factors to see if defendant had shown by clear and convincing evidence that custody should be changed. Its analysis resulted in its ultimate conclusion that custody should not be changed, consistent with the presumption.

the "mental and physical health of the parties involved."

Defendant points to the fact that, at the time of the lower court proceedings, plaintiff had not made any arrangements for housing in Virginia, and she had not made any arrangements to continue Kaylah's therapy. These facts were of no consequence. Plaintiff explained that she had not made any firm plans for housing, nor had she located any therapists for Kaylah, because she was awaiting the trial court's ruling whether she would be granted physical custody of Kaylah, and the court's ruling on whether she could change Kaylah's domicile to Virginia. No error is shown in the court's ruling on custody.

Defendant's final argument is that the trial court erred in allowing plaintiff to change Kaylah's domicile to Virginia. This Court reviews for an abuse of discretion a trial court's decision to allow a parent to remove a child from the state. *Overall, supra* at 458; *Anderson v Anderson,* 170 Mich App 305, 309; 427 NW2d 627 (1988). In determining whether to grant a request to change a child's state of domicile, a trial court must consider

"(1) whether the prospective move has the capacity to improve the quality of life for both the custodial parent and the child; (2) whether the move is inspired by the custodial parent's desire to defeat or frustrate visitation by the noncustodial parent and whether the custodial parent is likely to comply with the substitute visitation orders where he or she is no longer subject to the jurisdiction of the courts of this state; (3) the extent to which the noncustodial parent, in resisting the move, is motivated by the desire to secure a financial advantage in respect of a continuing support obligation; and (4) the degree to which the court is satisfied that there will be a realistic opportunity for visitation in lieu

of the weekly pattern which can provide an adequate basis
for preserving and fostering the parental relationship with
the noncustodial parent if removal is allowed. [*Overall,
supra* at 458-459, quoting *Anderson, supra* at 309."[2]

The moving party has the burden of establishing by a
preponderance of the evidence that the change in
domicile is warranted. *Overall, supra* at 459; *Anderson, supra* at 309.

Defendant challenges only the court's findings on
the first and fourth factors. With respect to the first
factor, "whether the prospective move has the capacity to improve the quality of life for both the custodial
parent and the child," the trial court stated the
following:

> Factor number one, I find that it is in the best interests of
> the child and her mother to live as a traditional nuclear
> family. The mother will not have to plan the child's care
> around her work schedule since she would be able to live
> without holding an outside job. And this will, after an
> adjustment period, improve their quality of life. The military
> will provide for the child's medical and educational needs,
> at least as well as they have been provided here in Lansing.

Defendant asserts that this finding was in error
given that, in Michigan, Kaylah would receive support
from all four of her grandparents. Defendant's argument has some support in the record. Defendant, his
parents, and plaintiff's parents all live in Lansing,
within a mile or two of each other. Kaylah's pediatrician testified that Kaylah was a "high needs" child
and that she would need to undergo therapy into her
adult years.

---

[2] This test is known as the *D'Onofrio* test. See *D'Onofrio v D'Onofrio*,
144 NJ Super 200, 206-207; 365 A2d 27 (1976).

Nevertheless, plaintiff testified that if she were able to take Kaylah to Virginia, she would assume the role of a stay-at-home mother. This would allow her to focus her energy on her family and on Kaylah's special needs. The child's pediatrician testified that Kaylah would benefit from living in a two-parent household with a full-time mother. A psychologist testified that this arrangement would be a "powerful positive" in Kaylah's life, and that two-parent households were more stable. In the psychologist's opinion, keeping Kaylah in Michigan would benefit defendant more than Kaylah. Finally, Mark Mogle's own parents live within one-half hour's drive from the Air Force base. In light of the foregoing, we conclude that the trial court did not err in finding that the first factor was satisfied.

In analyzing the fourth factor, the trial court concluded that "[t]here will be realistic opportunity for visitation there and also in Michigan where not only the Defendant, but both sets of grandparents can spend time with Kaylah." Defendant asserts that given the great distance between Michigan and Virginia, he will have no realistic opportunity for visitation with Kaylah.

Under the fourth factor, the new visitation plan need not be equal to the prior visitation plan in all respects. It only need provide a realistic opportunity to preserve and foster the parental relationship previously enjoyed by the noncustodial parent. *Anderson, supra* at 310-311. The visitation schedule contained in the court's final order generally provides that defendant will have visitation with Kaylah for two weeks during every other month. Further, the court ordered that transportation of Kaylah would be achieved by

the parties' meeting at a midpoint between the two states. We conclude that "there will be a realistic opportunity for visitation in lieu of the weekly pattern which can provide an adequate basis for preserving and fostering the parental relationship with the noncustodial parent if removal is allowed." *Overall, supra* at 459. In *Anderson, supra* at 311, this Court acknowledged the possibility that "extended periods of visitation will foster, not hinder, an even closer father-child relationship" than a typical weekly visitation schedule. We conclude that the trial court properly found that all four factors it was required to consider in determining whether to change a child's state of domicile were satisfied, and that it did not abuse its discretion in granting plaintiff's request to change Kaylah's state of domicile from Michigan to Virginia.

We affirm.