# STATE OF MICHIGAN

# COURT OF APPEALS

MATTHEW J. ROZEN,

　　　　　Plaintiff-Appellee,

v

KATIE M. ROZEN,

　　　　　Defendant-Appellant.

UNPUBLISHED
March 23, 2017

No. 333250
Genesee Circuit Court
LC No. 13-309379-DM

Before: M. J. KELLY, P.J., and MURPHY and RONAYNE KRAUSE, JJ.

PER CURIAM.

Following an eight-day custody trial, the trial court awarded plaintiff, Matthew Rozen, sole legal and physical custody of the parties' minor child. On appeal, defendant, Katie Rozen, raises a number of challenges to the court's order.[1] Because we discern no reversible error, we affirm.

## I. PHYSICAL CUSTODY

On appeal, Katie raises a number of challenges to the trial court's decision to award sole physical custody to Matthew. First, she asserts that the trial court erred because it did not find the existence of proper cause or a change of circumstances before proceeding with the child custody trial. Second, she argues that the trial court erred in finding that an established custodial environment existed with both parents. Third, she contends that even if an established custodial environment existed with both parents, the trial court's findings regarding several of the statutory factors used to determine the best interests of the children were against the great weight of the evidence and do not support the change in custody. We address each argument in turn.

## A. STANDARD OF REVIEW

Child custody disputes are governed by the Child Custody Act, MCL 722.21 *et seq.* "The act is intended to promote the best interests of children, and it is to be liberally construed." *Berger v Berger*, 277 Mich App 700, 705; 747 NW2d 336 (2008). When reviewing a trial

---

[1] For ease of reference, we will refer to the parties as Katie and Matthew.

court's decision in a child-custody dispute, three standards of review apply. *Kubicki v Sharpe*, 306 Mich App 525, 538; 858 NW2d 57 (2014). "We review findings of fact to determine if they are against the great weight of the evidence, we review discretionary decisions for an abuse of discretion, and we review questions of law for clear error." *Id*. "The trial court has committed clear error when this Court is definitely and firmly convinced that it made a mistake." *Parks v Parks*, 304 Mich App 232, 237; 850 NW2d 595 (2014) (citation omitted). "In child custody cases, an abuse of discretion occurs if the result [is] so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias." *Maier v Maier*, 311 Mich App 218, 221; 874 NW2d 725 (2015) (citation and quotation marks omitted; alteration in original). Further, "a trial court's findings regarding the existence of an established custodial environment and with respect to each factor regarding the best interest of a child under MCL 722.23 should be affirmed unless the evidence clearly preponderates in the opposite direction." *Berger*, 277 Mich App at 705.

## B. ANALYSIS

### 1. PROPER CAUSE OR CHANGE OF CIRCUMSTANCES

Katie argues that because there was a custody order in place before the child custody trial, Matthew was required to prove and the trial court was required to find that either proper cause or a change of circumstances existed before a child custody trial could occur. MCL 722.27(1)(c) provides that in a child custody dispute, a trial court may:

> modify or amend its previous judgments or orders for proper cause shown or because of change of circumstances . . . . The court shall not modify or amend its previous judgments or orders or issue a new order so as to change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child. . . .

In *Vodvarka v Grasmeyer*, 259 Mich App 499, 508-509; 675 NW2d 847 (2003), we explained that the first sentence of MCL 722.27(1)(c) requires the trial court to find by a preponderance of the evidence that there is either proper cause or a change of circumstances before it can "consider whether an established custodial environment exists" and before it conducts "a review of the best interest factors." The purpose of this threshold requirement is to "erect a barrier against removal of a child from an established custodial environment and to minimize unwarranted and disruptive changes of custody orders." *Id*. at 509 (citation omitted). Thus, in cases where a custody order is already in place, the party requesting a change of custody must establish by a preponderance of the evidence the existence of proper cause or change of circumstances before he or she is entitled to a child custody hearing. *Id*. Temporary custody orders, however, are an exception to this rule. *Thompson v Thompson*, 261 Mich App 353, 357; 683 NW2d 250 (2004). "By definition, a temporary custody agreement is only a *temporary* order pending further proceedings." *Id*. A temporary custody order is not an original or initial order, and there is no requirement that a court find proper cause or change of circumstances before issuing its first custody order. *Id*. at 361–362.

Here, the trial court entered two prior orders addressing child custody. First, in September 2013, the parties stipulated to a *temporary* order of joint legal custody. Subsequently, in December 2014, the trial court entered the judgment of divorce, which awarded the parties joint legal custody and specific parenting time. The judgment of divorce was entered with the understanding that the custody provision would be *temporary* and that a trial on a permanent custody situation would later occur. Therefore, because the previous orders were only temporary orders, the November 2015 child custody order awarding Matthew sole physical and legal custody was the initial custody determination, and the trial court did not err by failing to determine the existence of proper cause or change of circumstances in connection with that order. See *id*.

## 2. ESTABLISHED CUSTODIAL ENVIRONMENT

Katie next argues that the trial court erred in finding that the child had an established custodial environment with both parents. MCL 722.27(1)(c) provides that a custodial environment is established if

> over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort. The age of the child, the physical environment, and the inclination of the custodian and the child as to permanency of the relationship shall also be considered.

"An established custodial environment may exist with both parents where a child looks to both the mother and the father for guidance, discipline, the necessities of life, and parental comfort." *Berger*, 277 Mich App at 707. A child's custodial environment may exist in more than one household at a time. *Mogle v Scriver*, 241 Mich App 192, 197-198; 614 NW2d 696 (2000).

In this case, the child was evaluated by an infant mental health specialist, Erin Werth, who observed the child's interactions with both parents, including observations in both parents respective homes. Werth opined that the child demonstrated "secure attachment behavior" to both parties, although she believed the child's primary attachment was to Katie. She further opined that both parties demonstrated affection to the child and were good at teaching, nurturing, and pacing their interactions with the child. Additionally, the child's interactions with her parents were further evaluated by Dr. James Bow, a psychologist who conducted a three-month evaluation for child custody in this case. Dr. Bow interviewed the parties individually and together, observed them during interactions with the child, conducted psychological testing of both parties, reviewed documentation submitted by the parties, and conducted interviews with the child's preschool teacher, various therapists treating the parties or the child, and other individuals identified by the parties as having information about the case. On the basis of his multiple contacts with the parties and others, his review of the provided materials, and the tests that he administered, Dr. Bow concluded that the child naturally looked to both parents for guidance, discipline, and parental comfort. He further opined that the child had a custodial home with both parents. Moreover, as noted by the trial court, at the time of the child custody trial the parties shared a week on/week off parenting time schedule, which supports a finding that the child had a custodial environment with both parents. Finally, both parties submitted numerous photographs of the child while she was in their respective homes, which appear to depict the

child interacting positively with both parents. We therefore conclude that the trial court's finding that the child had an established custodial environment with both parents was not against the great weight of the evidence. *Berger*, 277 Mich App at 706.

## 3. BEST INTEREST FACTORS

A trial court cannot issue a new child custody order that changes a child's established custodial environment "unless there is presented clear and convincing evidence that it is in the best interest of the child." MCL 722.27(1)(c). In order to determine whether a change in established custodial environment is in the best interests of a child, the trial court must consider and evaluate the statutory factors in MCL 722.23. Katie argues that even if there were an established custodial environment with both parents, the trial court's findings regarding several of the statutory factors used to determine the best interests of the children were against the great weight of the evidence and do not support the change in custody. We disagree.

Factor (a) requires the court to consider, evaluate, and determine the "love, affection, and other emotional ties existing between the parties involved and the child." MCL 722.23(a). The trial court found that this factor favored the parties equally. On appeal, Katie asserts that this factor favored her, and that the trial court erred in evaluating it by focusing on its unsupported interpretation of her mental health issues. She contends the evidence from the infant mental health specialist, Werth, showed that the child was primarily attached to her and that the child felt free to openly express herself with her. However, although Werth testified that Katie appeared to be the child's primary attachment and primary caretaker, she also testified that the child was attached to Matthew and that both parents appeared able to support and care for the child. She also testified that the parent/child relationship between Katie and the child was functionally "very good," as was the relationship between Matthew and the child. She testified also that both parents were responsive to the child's needs. In addition to Werth's testimony, the trial court heard testimony from multiple witnesses that Katie had a close, affectionate, encouraging, and reassuring relationship with the child, and Katie submitted numerous photographs depicting that relationship. There was also testimony from multiple witnesses that there was love, affection, and other emotional ties between Matthew and the child, and he also submitted numerous photographs depicting that relationship. Based on this record, the trial court's finding that both parties were favored under factors (a) was not against the great weight of the evidence.

Factor (b) requires the court to consider, evaluate, and determine the "capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any." MCL 722.23(b). The court found that this factor favored both parties equally. Katie argues that the court again ignored testimony that showed her mental health issues would not impact her ability to care for the child. Again, although the court expressed concern about the potential effects Katie's mental health issues would have on the child, there was ample evidence that both parties had the capacity to provide love and affection to the child and to provide guidance to the child with regard to education and religion. The fact that the court had concerns about Katie's mental health and that it was concerned about potential disagreements on the child's future educational endeavors does not negate the testimony supporting the court's finding that both parties were

equal. We conclude that the court's findings on factor (b) were not against the great weight of the evidence.

Factor (c) requires the court to address the "capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs." MCL 722.23(c). On this factor, the court found that Matthew was strongly favored because Katie had let her "negative perceptions" about Matthew affect her capacity to attend to the child's mental and physical medical needs. Based on the record before us, it is plain that Katie believed Matthew domestically abused her, physically and sexually abused their daughter, and that he was a bad parent. After an evidentiary hearing several months before the custody trial, the trial court found that the allegations of domestic abuse were unwarranted. After multiple Child Protective Services (CPS) investigations, the allegations of sexual and physical abuse against the child were unsubstantiated. Nevertheless, there was testimony that Katie subjected the child to intrusive medical examinations that were deemed to be unnecessary, and that she was insistent on the child's need to participate in therapy despite her young age and despite recommendations that she did not need therapy.[2] Given that evidence, we cannot conclude that the trial court's findings on factor (c) were against the great weight of the evidence.

Factor (d) requires the trial court to address "[t]he length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity." MCL 722.23(d). Factor (e) requires the court to address "[t]he permanence, as a family unit, of the existing or proposed custodial home or homes." MCL 722.23(e). Katie argues that the trial court erred by failing to make specific factual findings on these factors, and she asserts that she should have been favored on both. The court, however, made findings on both factors and concluded that the parties were equally favored on both. With regard to factor (d) the court found that both parties "provide stable and satisfactory environments for the child." As previously noted, there was testimony that the child had a week-on/week-off schedule with the parties. There was also testimony that she was attached to both parents and that she had a custodial environment with both of them. With regard to factor (e), the court found that the family unit proposed by both parties would consist of "themselves with the child," so they were equal on that factor. That finding comports with the testimony presented at trial. Accordingly, we conclude that the trial court made findings on factors (d) and (f) and that those findings were not against the great weight of the evidence.

---

[2] We are cognizant that there was testimony from Werth that it might be beneficial to engage the child in therapy because Katie's anxiety meant that she could be viewing the child's behaviors through the lens of her anxiety, so a therapist for the child could offer an independent identification and interpretation of the child's behavior. However, there was also evidence that the child did not have any issues requiring therapy and that it would not be recommended until she was older.

Factor (f) requires the court to address the "moral fitness of the parties involved." MCL 722.23(f). Katie suggests that the trial court erred in finding the parties equal on this factor because Matthew "forgot" to disclose a guilty plea conviction for obstruction of justice and because he failed to disclose at least one of his bar fights. She asserts those facts show that Matthew lacks veracity and honesty, which relates to his capacity to set a moral example as a parent. She argues that the court should have found that this factor strongly favored her. The trial court, however, did not find credible Katie's arguments that Matthew was not morally fit. And when reviewing the court's factual findings, "this Court defers to the trial court's determination of credibility." *Sinicropi v Mazurek*, 273 Mich App 149, 155; 729 NW2d 256 (2006). Moreover, "questionable conduct is relevant to factor f only if it is a type of conduct that necessarily has a significant influence on how one will function *as a parent*." *Fletcher v Fletcher*, 447 Mich 871, 886-887; 526 NW2d 889 (1994). A non-exhaustive list of questionable conduct pertinent to an individual's moral fitness as a parent includes: "verbal abuse, drinking problems, driving record, physical or sexual abuse of children, and other illegal or offensive behaviors." *Id*. at 887 n 6. Here, there was evidence that both parties consumed alcohol on a routine basis. While Katie asserted that Matthew continued to consume large amounts of alcohol following the birth of the child, several of the incidents used by Katie as examples of Matthew's deficient behavior occurred before the minor child's birth. Further, although Matthew acknowledged consuming alcohol, there was no evidence that he consumed alcohol while the child was in his custody or that his consumption negatively affected his parenting. Moreover, the record reflects that despite his alcohol consumption, Matthew maintained his employment and did not have any recent or current accidents or arrests for driving under the influence. Likewise, although there were four CPS investigations conducted during the case, the investigations undertaken did not reference any concerns regarding Matthew's alcohol consumption. Thus, the trial court's finding that the parties were equal on factor (f) is not against the great weight of the evidence.

Factor (g) requires the court to address "[t]he mental and physical health of the parties involved." MCL 722.23(g). The court found this factor strongly favored Matthew and that it was the most significant factor in the court's best-interests analysis. Katie argues, however, that the court's findings on her mental health were unsupported by the record. We disagree. The court found Katie's diagnoses and prescribed medications did not raise any concerns regarding parenting, and the court credited Katie with recognizing her mental health issues and taking steps to address them, including maintaining therapy and treatment to prevent future destabilization in her behavior. Nevertheless, the court found that the barrier to parenting arose because of how Katie's mental health issues affected her perception of Matthew. She testified that Matthew had verbally and physically abused her during the marriage because he called her names and because he snapped towels at the backs of her legs and pinched and poked her. Matthew acknowledged the behavior, but contended that it was joking and playful and that he stopped when she asked him to do so. The trial court found that domestic violence was not a factor in the case despite Katie's perception that it was. Further, during the case there were four CPS investigations, two with allegations that Matthew had physically abused the child and two with allegations that Matthew had sexually abused the child. None of the allegations were substantiated; however, there was evidence that Katie nevertheless continues to believe that the abuse occurred. In addition, the trial court expressed concern that Katie's projection of her own mental health concerns onto the child, without any demonstrable evidence of the child having a problem, could result in a "self-fulfilling prophecy," and ultimately impair the child's relationship with Matthew.

-6-

These findings were consistent with Dr. Bow's evaluation. Thus, based on the record before us, the court's findings on factor (f) are not against the great weight of the evidence.

Factor (h) requires the court to address the "home, school, and community record of the child." MCL 722.23(h). The trial court favored Matthew on this factor. In doing so, the court emphasized the disconnect between Katie's perception of the child's functioning in these various settings when compared to the observations of the infant mental health specialist, the child's preschool teacher, and Dr. Bow. Our review of the record reflects that numerous witnesses testified that the child was well-adjusted, mentally healthy, and doing well at both the daycare Katie selected and the one that Matthew selected. Thus, the trial court's evaluation of this factor was consistent with the reports of experts and others who had the opportunity to observe the child in the various settings. The court's findings on this factor were not against the great weight of the evidence.

Factor (j) requires the court to address "[t]he willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents." The court found that this factor favored Matthew. The trial court, referencing the evaluation and conclusions reached by Dr. Bow, found that Katie's perception of Matthew as dangerous, threatening and neglectful of the child constituted a "destructive dynamic." While both parties failed to communicate with each other, early in the litigation Katie refused to communicate directly with Matthew premised on her asserted fear of his behavior and she rebuffed any attempts by him, no matter how innocuous, to discuss their situation or attempt to resolve her concerns. In addition, there was evidence that Katie continued to retain concerns regarding abuse despite the outcome of the CPS investigations and Werth's professional opinion that such concerns were unwarranted. Furthermore, despite the existence of two homes owned by the parties in relatively close geographic proximity, Katie elected to leave with the child and move to a distance that was preclusive to Matthew having daily contact with the child. In contrast, despite certain failures, Matthew responded appropriately to the majority of communications initiated by Katie and contacted her for important matters, such seeking of medical attention for the child. Given the evidence, the trial court's finding on this factor was not against the great weight of the evidence.

Finally, factor (k) addresses the presence of "[d]omestic violence, regardless of whether the violence was directed against or witnessed by the child." MCL 722.23(k). The court found that this factor was inapplicable. Katie argues, however, that it was applicable and favored her. Katie accused Matthew of towel snapping and pinching her and, on occasion, verbally demeaning or threatening her. Matthew countered that both parties engaged in these behaviors, and thought that they were playful interactions or done in a joking manner. No extraneous evidence, such as a police or medical report or eyewitness testimony was introduced to substantiate either version of this behavior. The trial court was particularly concerned with the manner in which Katie's mental health issues caused her to misperceive the behavior of Matthew. An example of the misperception is evident in the parties differing accounts of the night before Katie left the martial home. According to Matthew, the parties had a disagreement regarding their marriage, which included raised voices. Katie, however, perceived Matthew's behavior of pointing his finger at her while in close proximity as threatening because she feared he would shoot her or kill her even though he never made such a threat and did not physically move to obtain or display a firearm. We note that the trial court did not treat Katie's complaints

-7-

with disdain. It acknowledged her perception of the events and expressed a desire to be sensitive to her concerns. Yet, even assuming the truth of Katie's allegations, the trial court did not believe the incidents of abuse alleged by Katie rose to the level of domestic violence. The trial court's finding that there was no domestic violence was essentially a finding that Matthew's version of events was more credible. We will defer to that credibility assessment. See *Sinicropi*, 273 Mich App at 155. Given the demonstrable concerns pertaining to Katie's perception of events and the effect of her mental health issues, the trial court's decision to find factor (k) inapplicable was not against the great weight of the evidence.

Based on the whole record, the trial court's findings on the statutory best interest factors were not against the great weight of the evidence.[3]

## II. PARENTING TIME

Next, Katie very briefly argues that the trial court erred by essentially reversing the parties' parenting time schedule so that Katie had less time. She asserts without analysis that the trial court's parenting time decision was not in the best interest of the child and that the court failed to consider the specific parenting time factors in MCL 722.27a(7). "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). Accordingly, we will not review this issue further.[4]

---

[3] In conjunction with her challenge to the trial court's findings regarding best interests, Katie briefly argues that she was denied due process at trial because the trial court did not allow her lawyer to rebut Matthew's closing argument. Although the court denied Katie's lawyer permission to submit a written brief in lieu of closing arguments, the court permitted the parties additional time to prepare for oral closing arguments. The court then allowed Matthew, the moving party, to provide a closing argument, Katie to provide a closing argument, and Matthew to provide a rebuttal argument. On appeal, Katie does not explain how the failure to permit a sur-rebuttal of Matthew's rebuttal argument deprived her of due process. Nor does she explain what information she would have raised had she been allowed a sur-rebuttal. Because Katie failed to support her challenge by analyzing the applicable law and facts, we need not address this claim further. See *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959).

[4] We do not, however, that MCL 722.27a(7) only provides a list of factors that the court *may* consider. Further, we note that MCL 722.27a requires the court to grant parenting time "in accordance with the best interests of the child." "It is presumed to be in the best interests of a child for the child to have a strong relationship with both of his or her parents," and parenting time should be "granted to a parent in a frequency, duration, and type reasonably calculated to promote a strong relationship between the child and the parent granted parenting time." MCL 722.27a(1). Here, the trial court stated that its priority in awarding parenting time was to "maintain the healthy aspects of the child's relationship" with Katie, and the order entered

-8-

### III. LEGAL CUSTODY

Finally, Katie briefly argues the trial court's decision to grant Matthew sole legal custody was erroneous. We disagree.

In evaluating legal custody, the best interest factors of MCL 722.23 are pertinent, but are construed with a view to "[w]hether the parents will be able to cooperate and generally agree concerning important decisions affecting the welfare of the child." See MCL 722.26a(1)(a) and (b). The focus in awarding legal custody is on the parties' ability to cooperate on "basic child-rearing issues." *Nielsen v Nielsen*, 163 Mich App 430, 434; 415 NW2d 6 (1987). Here, the parties both asserted to the trial court that they believed they would not be able to cooperate regarding major decisions, and based on the evidence, the trial court agreed. In awarding sole legal custody to Matthew, the trial court observed that there had already been significant disagreements between the parties pertaining to school enrollment. The court further reiterated its determination that Katie's "judgment is negatively affected by her mental health." The record supports the trial court's findings. For example, there was testimony that Katie elected to have the child subjected to intrusive medical examinations despite the absence of any substantiation of sexual abuse. There was also testimony that she insisted the child needed therapy even though her claims regarding the child's behavior were unsubstantiated. Finally, there was significant evidence that Katie was initially reluctant to engage in any direct contact with Matthew, and her trial testimony reflected that she continued to distrust Matthew and see him as an unfit parent. Further, given that Matthew was designated by the trial court to serve as the primary caretaker of the child, it cannot be concluded that the trial court's decision to also award him sole legal custody was an abuse of discretion, i.e., "palpably and grossly violative of fact and logic." *Dailey v Kloenhamer*, 291 Mich App 660, 664-665; 811 NW2d 501 (2011).

Affirmed. Matthew, as the prevailing party, may tax costs. MCR 7.219(A).

/s/ Michael J. Kelly
/s/ William B. Murphy
/s/ Amy Ronayne Krause

---

established a parenting time schedule that allowed Katie multiple contacts with the child. Thus, it appears that the trial court did consider the child's best interests in awarding parenting time.