*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DIAMOND DENEICE BATES,

      Plaintiff-Appellant,

v

KIEONDRE DEQUAN ARKWRIGHT,

      Defendant-Appellee.

UNPUBLISHED
April 20, 2023

No. 362526
Genesee Circuit Court
Family Division
LC No. 20-925201-DS

Before: O'BRIEN, P.J., and MURRAY and LETICA, JJ.

PER CURIAM.

Plaintiff appeals as of right the trial court's order granting defendant's motion to change custody of the parties' minor child, KJA. We vacate the trial court's opinion and order and remand to the trial court to make findings and a determination regarding joint legal custody in accordance with *Pierron v Pierron*, 486 Mich 81, 89-90; 782 NW2d 480 (2010).

## I. BASIC FACTS AND PROCEDURAL HISTORY

In May 2020, plaintiff initiated this case by requesting child support for minor child, KJA, from defendant. The trial court awarded plaintiff child support and interim sole legal and physical custody. Defendant, an out-of-state resident, filed a motion to modify custody, requesting that the trial court award him joint legal custody, maintain plaintiff's sole physical custody, and award him parenting time. Plaintiff and defendant entered into a stipulated parenting time agreement in April 2022, which awarded defendant scheduled parenting time in Michigan. As a result, defendant withdrew his request for the trial court to amend parenting time. The issue of child support was referred to the Friend of the Court. Consequently, the trial court conducted a hearing limited to the issue of joint legal custody during which the only testimony was taken from the parties.

-1-

Plaintiff testified that she lived in Dallas, Texas, and defendant lived in Denver, Colorado.[1] Nonetheless, the couple engaged in a long-distance relationship. After plaintiff became pregnant, defendant advised that he would not take care of plaintiff.[2] Shortly before their minor child, KJA, was born in December 2019, plaintiff moved to Flint, Michigan to raise KJA with support from her family. Initially, plaintiff and KJA lived with plaintiff's family, but later moved to a separate home. Plaintiff was KJA's primary caretaker, and plaintiff spent every day with KJA. Plaintiff taught the child sign language, enrolled her in a Montessori school, took her to church, and took her to extracurricular activities, such as swimming, if the necessary funding was available. Although plaintiff had been enrolled in nursing school, she stopped pursuing her studies to raise KJA. Additionally, plaintiff was not focused on friendships or relationships but on raising the child. Plaintiff worked 8:00 a.m. to 4:00 p.m. on weekdays. Plaintiff's father drove KJA to school in the morning and plaintiff picked her up from school after work. Plaintiff and KJA frequently ate dinner with plaintiff's family.

Plaintiff placed a focus on engaging KJA in educational activities and the child met all of her milestones. Plaintiff notified defendant when KJA was hospitalized or if she suffered from a serious medical condition. Plaintiff selected KJA's school, church, and treating physician without input from defendant. When asked about unilateral decisions for the child and her care, plaintiff explained that it was hard to coordinate with defendant because he lived in Colorado. Additionally, plaintiff explained that the former couple could not communicate maturely about major life decisions for KJA, describing defendant as "verbally abusive." Plaintiff testified that defendant was "rude" and "nasty" to her. Moreover, she did not want to seek defendant's permission "every time something comes about." But plaintiff did not seek to prevent defendant from learning about KJA's health from the physician or about KJA's schooling.

Plaintiff opined that she had a much stronger bond with KJA than defendant. Defendant was entitled to spend one weekend a month in Michigan with KJA; however, he did not exercise all his parenting time. KJA whined when she had to go with defendant and was uneasy when she returned from the parenting time. Additionally, defendant brought KJA home early from the parenting time because the child cried for plaintiff. Plaintiff provided KJA with food, clothing, and medical care. Plaintiff testified that defendant was in arrears with his child support and only sent one package of items for KJA. After plaintiff initiated the action seeking child support from defendant, he called and cursed at her. Plaintiff opposed defendant's request for joint legal custody, stating that it was hard to coordinate with defendant from Colorado, that defendant was "controlling," and that she had learned to advocate for herself and KJA with defendant.

Defendant testified that he previously worked for the Denver Nuggets as the director of youth basketball and fan strategy. After being terminated from that position, defendant was receiving unemployment benefits. Initially, defendant did not have visits with KJA because of the

---

[1] Apparently, defendant initially lived in Los Angeles, California, but moved to Colorado in November 2019. Plaintiff also testified that defendant lived with her in Texas for a period of time when she was pregnant.

[2] The statement of facts consists of a summary of the testimony from plaintiff and defendant. To the extent the testimony conflicted, the trial court did not make any finding regarding credibility.

pandemic, but he began having video visits with her through Facetime or Zoom. Although KJA had never visited defendant in Colorado, KJA could see defendant's dogs and had her own dog. As a result of these visits, defendant opined that they had a "good time" and a strong bond. Defendant also attempted to call KJA every day although sometimes plaintiff did not answer the phone.

When defendant visited Flint for parenting time, KJA did not want to leave defendant's side. They ate breakfast together, watched cartoons, and visited the store or aquarium. Defendant had KJA spend time with her three young cousins. If KJA wanted to contact plaintiff during his parenting time, defendant would use his phone to allow KJA to Facetime with plaintiff. Defendant arranged for birthday parties for KJA in Flint and invited plaintiff and her family to attend, stating that it was important for KJA to see her parents interacting. At the start of defendant's visitation, there was one incident when plaintiff's brother initiated a fight and plaintiff cursed at defendant while holding KJA. But defendant opined that his interactions with plaintiff were now "good," and they were not having disagreements. He concluded that they could now coparent. Defendant did not have any issues pertaining to KJA's education, medical treatment, or religious training. He opined that plaintiff was an "excellent mother," and that KJA was in "good hands."

Defendant testified that he supported KJA financially. He sent her monthly packages containing shoes and clothes. In fact, defendant even purchased items for plaintiff when she was pregnant.[3] When defendant went shopping with KJA, he left the purchases in Flint, explaining "I can't do anything with them, I live in Colorado." Defendant currently lived in his girlfriend's condominium in Colorado. He had not introduced his girlfriend to KJA and would not do so until the girlfriend was introduced to plaintiff. Defendant denied that he had a criminal record or issues with drugs or alcohol.

Defendant asserted that plaintiff failed to keep him apprised of KJA's medical appointments, he did not have any input, and he only learned of the appointments through receipt of a bill. He was unable to contact the doctor's office directly and receive information. When asked why he was requesting joint legal custody, defendant proffered that he wanted to be involved in KJA's life as well as make decisions pertaining to her. Defendant opined that KJA needed him in her life, and the sole purpose of his request was to remedy not being able to see KJA.[4]

On cross-examination, defendant acknowledged that he was seeking joint legal custody but further asserted that his career, now at an executive level, precluded him from living in Flint near KJA. Although defendant interviewed with the Detroit Pistons for a youth sports position, the proposed salary was only $30,000 a year. Defendant disagreed that a physical presence in proximity to KJA would allow him to have a stronger emotional bond with her. Even so, he agreed that, in some circumstances, he would be better able to raise KJA if he was physically present in

---

[3] Defendant testified that his bank statements reflected expenditures for plaintiff, but they were not admitted at the hearing.

[4] Defendant testified that, "[Plaintiff's] holding [KJA] from me, that's, that's why we're here." Defendant also attested that because of his career, he was able to teach KJA different things about life.

Michigan. Defendant opined that he could provide for KJA's emotional needs, discipline, and day-to-day involvement from wherever he lived. He acknowledged that he only came to Michigan once a month, but declined to characterize it as a "drop-in." Defendant explained that it was currently what he was able to do. Defendant acknowledged that he had not taken KJA physically to church or to the doctor. He denied this occurred due to his lack of a physical presence in Michigan, but blamed plaintiff. Defendant testified, "I've been kept in the dark about, you know, her whereabouts and all of that stuff. That's why we're here." After acknowledging that plaintiff did not prevent defendant from taking KJA to church or the doctor, defendant testified that he would fly back to Michigan as needed.

Defendant testified that he was not involved with the selection of KJA's Montessori school and that plaintiff obstructed his involvement. Again, defendant blamed plaintiff, contending that she kept him "in the dark" and did not provide information regarding KJA's teachers.[5] When asked if there were communication issues between the parties or obstruction was at issue, defendant testified it was "a little bit of both." Defendant testified that he did not pick KJA's church or school because he was "left in the dark." Nonetheless, he continued to characterize plaintiff as "an excellent mother" and acknowledged that he had no problems with her selections. When asked whose fault it was that KJA did not see defendant more, he responded, "That's why we're here trying to find out . . . . It's not my fault." Later, defendant conceded that he agreed to the parenting time schedule consisting of monthly visits. He admitted to leaving messages in which he cursed at plaintiff but could not recall the timeframe. Finally, defendant acknowledged moving away from Flint in 2008, and expressed his only reason to return was to see KJA.

The trial court issued an opinion and order. Although it recognized that the parties raised issues pertaining to an established custodial environment and best interests, the trial court merely conducted an analysis of the best interest and parenting time factors. The trial court then went on to conclude that it was in KJA's "best interest that the parties share joint legal custody" with plaintiff retaining sole physical custody. Although the parties did not submit the issue of parenting time to the trial court, it sua sponte addressed a future parenting time schedule. The trial court concluded that when KJA reached the age of five,[6] defendant would be entitled to "longer periods of parenting time" at his residence, regardless of what state he lived in at the time. From this decision, plaintiff appeals.

## II. STANDARD OF REVIEW

This Court applies three standards of review in custody cases. *Martin v Martin*, 331 Mich App 224, 234; 952 NW2d 530 (2020). A trial court's factual findings are reviewed to determine if they are against the great weight of the evidence. *Yachcik v Yachcik*, 319 Mich App 24, 31; 900

---

[5] We note that an award of joint legal custody would not necessarily remedy the actions defendant complained of because, plaintiff, with whom KJA resides, remained entitled to make routine decisions. See MCL 722.26a(4) ("During the time a child resides with a parent, that parent shall decide all routine matters concerning the child."). There was no testimony that defendant attempted to access online resources, such as a school website, to acquire information.

[6] The trial court noted that KJA was approximately 2 ½ years old at the time of the hearing.

-4-

NW2d 113 (2017). "A finding of fact is against the great weight of the evidence if the evidence clearly preponderates in the opposite direction." *Pennington v Pennington*, 329 Mich App 562, 570; 944 NW2d 131 (2019). A trial court's determination regarding whether a party has demonstrated proper cause or change of circumstances is also reviewed for the great weight of the evidence. *Stoudemire v Thomas*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 360441), slip op at 4. And the trial court's factual findings regarding the best-interests factors under MCL 722.23 should be affirmed unless the finding was against the great weight of the evidence, *Berger v Berger*, 277 Mich App 700, 705; 747 NW2d 336 (2008).

"[Q]uestions of law are reviewed for clear legal error. A trial court commits legal error when it incorrectly chooses, interprets, or applies the law." *Sulaica v Rometty*, 308 Mich App 568, 577; 866 NW2d 838 (2014). Discretionary rulings, such as custody decisions, are reviewed for an abuse of discretion. *Martin*, 331 Mich App at 234. "To whom custody is granted is a discretionary dispositional ruling." *Fletcher v Fletcher*, 447 Mich 871, 880; 526 NW2d 889 (1994). The trial court's custody award should be affirmed unless an abuse of discretion occurs. *Id*. But, the trial court's discretion is not unfettered because it is limited by the statutory best-interest factors of MCL 722.23 that the trial court must carefully evaluate. *Id*. at 881. Generally, a trial court's custody decision is entitled to the utmost level of deference. *Shulick v Richards*, 273 Mich App 320, 325; 729 NW2d 533 (2006). To constitute an abuse of discretion, the custody award "must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias." *Id*. at 324 (quotation marks and citation omitted).

## III. ESTABLISHED CUSTODIAL ENVIRONMENT

Plaintiff contends that the trial court erred by failing to determine whether an established custodial environment existed before addressing custody. We agree that the trial court committed a clear legal error when it did not address the established custodial environment. We need not remand this issue to the trial court for further consideration because there is sufficient information in the record to make this determination de novo, and we conclude that the established custodial environment exists with plaintiff. See *Sulaica*, 308 Mich App at 585.[7]

When making determinations regarding custody,

> trial courts must first address whether an established custodial environment exists. If it does, the trial court must determine whether the requested change would affect the established custodial environment of the child and, dependent on that outcome, ascertain the proper burden of proof to be employed. If the proposed change alters the established custodial environment, the party seeking the change must demonstrate by clear and convincing evidence that the change is in the child's best

---

[7] On appeal, the parties agreed that the record was sufficient to find that an established custodial environment existed with plaintiff, and a remand was unnecessary on this point. However, defendant further asserted that the trial court could simultaneously award him joint legal custody regardless of the established custodial environment with plaintiff.

-5-

interests. If the change does not alter the established custodial environment, then the proponent of the change need only demonstrate by a preponderance of the evidence that the requested change is in the child's best interests. [*Marik v Marik*, 325 Mich App 353, 362; 925 NW2d 885 (2018), citing *Pierron*, 486 Mich at 89-90.]

The existence of a temporary custody order does not preclude a finding that an established custodial environment exists. *Berger*, 277 Mich App at 706-707. "The custodial environment of a child is established if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort." MCL 722.27(1)(c). When determining whether an established custodial environment exists, a trial court shall also consider "[t]he age of the child, the physical environment, and the inclination of the custodian and the child as to permanency of the relationship." *Id*. "An established custodial environment is one of significant duration in which the relationship between the custodian and child is marked by qualities of security, stability and permanence." *Mogle v Scriver*, 241 Mich App 192, 197; 614 NW2d 696 (2000) (quotation marks and citations omitted).

Here, the record is sufficient to demonstrate that KJA had an established custodial environment with plaintiff. KJA resided with and was raised by plaintiff her entire life. Plaintiff served as KJA's primary caretaker. Plaintiff ensured that all of KJA's needs were met, including food, clothing, housing, and medical care. In addition to enrolling the toddler in school, plaintiff engaged KJA in educational activities. Plaintiff also enrolled KJA in extracurricular activities when they were affordable and took her to church. Plaintiff sacrificed other relationships and a degree in nursing to attend to KJA's needs. Defendant only visited KJA in Michigan 13 to 14 times, and interacted with her only during the monthly, scheduled parenting visits. Further, defendant had brought KJA back early from parenting time visits because she cried for plaintiff. Under the circumstances, the record evidence sufficiently demonstrates that KJA looked to plaintiff, and not defendant, "for guidance, discipline, the necessities of life, and parental comfort," and an established custodial environment existed with plaintiff only. MCL 722.27(1)(c).

## IV. CHANGE IN ESTABLISHED CUSTODIAL ENVIRONMENT

We further conclude that remand is required because the trial court clearly erred by failing to determine whether awarding defendant joint legal custody would modify the child's established custodial environment prior to addressing the child's best interests, a necessarily predicate determination.

After determining whether a custodial environment exists, a trial court considering an important decision affecting the welfare of a child must then "determine whether the proposed change would modify the established custodial environment of that child." *Pierron*, 486 Mich at 92. This is because a trial court may not "modify or amend its previous judgments or orders or issue a new order so as to change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child." MCL 722.27(1)(c). Consequently, if the proposed change would modify the established custodial environment, the proponent of the change must demonstrate by clear and convincing evidence that the proposed change is in the child's best interests. MCL 722.27(1)(c); *Pierron*, 486 Mich at 92. If the proposed change would not modify an established custodial environment, then the proponent

of the change need only demonstrate by a preponderance of the evidence that the proposed change is in the child's best interests. *Id*. at 92-93.

A change to an established custodial environment occurs if there is a change regarding which parent the child naturally looks to "for guidance, discipline, the necessities of life, and parental comfort." MCL 722.27(1)(c). The child's standpoint, rather than the parent's, is controlling in determining whether a proposed change would modify an established custodial environment. *Pierron*, 486 Mich at 92. If the trial court's proposed change would not vary to whom the child naturally looks to for guidance, discipline, the necessities of life, and parental comfort, then the child's established custodial environment would not change. *Pierron*, 486 Mich at 86. Although minor modifications to parenting time do not change a child's established custodial environment, changes to parenting time that significantly reduce the amount of time a parent with an established custodial environment spends with a child may change the child's established custodial environment. *Lieberman v Orr*, 319 Mich App 68, 89-91; 900 NW2d 130 (2017).

To determine whether joint legal custody is in the child's best interests, the trial court must consider whether the parents will cooperate and reach an agreement addressing important decisions affecting the child's welfare. MCL 722.26(1)(b); *Bofysil v Bofysil*, 332 Mich App 232, 249; 956 NW2d 544 (2020).

> In order for joint custody to work, parents must be able to agree with each other on basic issues in child rearing–including health care, religion, education, day to day decision-making and discipline–and they must be willing to cooperate with each other in joint decision-making. If two equally capable parents whose . . . relationship has irreconcilably broken down are unable to cooperate and to agree generally concerning important decisions affecting the welfare of their children, the court has no alternative but to determine which parent shall have sole custody of the children. [*Bofysil*, 332 Mich App at 249, quoting *Fisher v Fisher*, 118 Mich App 227, 232-233; 324 NW2d 582 (1982).]

Because the trial court failed to determine whether a change in joint legal custody would change the child's established custodial environment, the trial court made a clear legal error and remand is required for the trial court to make this determination *before* determining the issue of joint legal custody. See *Pierron*, 486 Mich at 92. Additionally, the failure to determine whether the proposed change would alter the child's established custodial environment precluded a determination regarding the appropriate standard of review when analyzing the best-interests factors. *Pierron*, 486 Mich at 92. We therefore remand this case with instructions for the trial court to make this determination before addressing the best-interest factors. If the trial court finds that awarding joint legal custody would change the established custodial environment, it may only

award joint legal custody after finding by clear and convincing evidence that this is in the child's best interests. *Id.*[8]

## V. MODIFICATION OF PARENTING TIME

Plaintiff contends that the trial court erred by failing to determine whether proper cause or change of circumstances existed to warrant modification of parenting time, or determine whether there was an established custodial environment before modifying parenting time. We agree that the trial court erred in modifying future parenting time because the issue was not presented for a determination.

The Child Custody Act, MCL 722.21 *et seq.*, governs matters relating to parenting time. MCL 722.27(1)(c) provides that a trial court may only "[m]odify or amend its previous judgments or orders for proper cause shown or because of change of circumstances." Proper cause or a change of circumstances must be established before a trial court can modify a parenting time order. *Shade v Wright*, 291 Mich App 17, 22; 805 NW2d 1 (2010). A determination regarding the existence of an established custodial environment must also be made when addressing parenting time. *Pierron*, 486 Mich at 86. If a modification of parenting time would change the child's established custodial environment, the moving party must show by clear and convincing evidence that it is in the child's best interests. *Id.* at 92.

In this case, the parties reached an agreement regarding parenting time and did not seek any modification. Accordingly, we vacate the trial court's determination modifying parenting time.

Vacated and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Colleen A. O'Brien
/s/ Christopher M. Murray
/s/ Anica Letica

---

[8] Because we conclude that remand is required for the trial court to make these findings regarding the applicable standard of review necessary to review the best-interest factors, we need not address plaintiff's additional arguments regarding the trial court's analysis of the best-interest factors. We note, however, that the trial court did not make any credibility determinations or address the disparities in the parties' testimony.